SEALED

X FILED ___ LODGED
___ RECEIVED ___ COPY

JUN 2 5 2025

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY ___ DEPUTY

Nicholas A. Verderame
Bar No. 030683
Plattner Verderame PC
316 E. Flower St.
Phoenix, AZ 85012
Telephone: (602) 266-2002, x.106
Fax: (602) 266-6908
nverderame@pvazlaw.com

Renée Brooker
D.C. Bar No. 430159
(*pro hac vice* filing to follow)
Tycko & Zavareei LLP
2000 Pennsylvania Avenue NW
Suite 1010
Washington, DC 20006
(202) 417-3664
Fax: (202) 973-0950
reneebrooker@tzlegal.com

*Attorneys for Plaintiff-Relator*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**
**PHOENIX DIVISION**

UNITED STATES OF AMERICA *ex rel.* JSABF LLC,

Plaintiff-Relator,

v.

DALTON CORPORATION f/d/b/a CHICAS CABARET, C.N.C.G. LLC d/b/a CHICAS CABARET, DNC PARKS & RESORTS TUSAYAN HOTEL, INC. d/b/a THE SQUIRE AT GRAND CANYON, A HOLIDAY INN RESORT f/d/b/a SQUIRE RESORT AT THE

**Civil Action No.** CV25-08136-PCT-DJH

**COMPLAINT**

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

**Jury Trial Requested**

GRAND CANYON f/k/a SQUIRE MOTOR INNS, INCORPORATED and SQUIRE MOTOR INNS INCORPORATED, DELAWARE NORTH COMPANIES PARKS & RESORTS, INC., DELAWARE NORTH COMPANIES, INC., LEE & J HOSPITALITY, INC., STERLING REAL ESTATE PARTNERS, LLC, and WHITE STALLION RANCH, INC.,

Defendants.

## Table of Contents

I. STATEMENT OF THE CASE ..... 1
II. LEGAL FRAMEWORK ..... 3
A. Parties ..... 3
B. Jurisdiction and Venue ..... 5
C. Federal False Claims Act ..... 6
D. Statute of Limitations ..... 8
III. THE RESTAURANT REVITALIZATON FUND ..... 8
IV. THE FRAUDULENT SCHEME ..... 15
A. Squire Motor Inns ..... 16
B. Lee & J Hospitality ..... 18
C. White Stallion Ranch ..... 19
D. Chicas Cabaret ..... 21
V. MATERIALITY ..... 23
VI. COUNTS ..... 27

1. This is a False Claims Act *qui tam* action by Relator to recover treble damages and civil penalties arising from the actions of four distinct set of Defendants: (a) DNC Parks & Resorts Tusayan Hotel, Inc. d/b/a The Squire at Grand Canyon, a Holiday Inn Resort f/d/b/a Squire Resort at the Grand Canyon f/k/a Squire Motor Inns, Incorporated and Squire Motor Inns Incorporated; Delaware North Companies Parks & Resorts, Inc.; Delaware North Companies, Inc. (collectively identified as "Squire Motor Inns"); (b) Lee & J Hospitality, Inc. and Sterling Real Estate Partners, LLC (collectively identified as "Lee & J Hospitality"); (c) White Stallion Ranch, Inc. ("White Stallion Ranch"); and (d) Dalton Corporation f/d/b/a Chicas Cabaret and C.N.C.G. LLC d/b/a Chicas Cabaret (collectively identified as "Chicas Cabaret").

## I. STATEMENT OF THE CASE

2. Defendants are four sets of unrelated Arizona businesses that improperly obtained over $7,246,000 in pandemic relief grants intended only for restaurants for which they were knowingly ineligible. Two sets are hotels (Squire Motor Inns and Lee & J Hospitality), another is a "dude ranch" (White Stallion Ranch), and the fourth is a strip club (Chicas Cabaret). None were eligible restaurants. Squire Motor Inns was the largest recipient of one of these grants in the state of Arizona. They all exploited the pandemic for personal gain.

3. After the 2020 global outbreak of the coronavirus disease, Congress enacted programs to support and fund struggling businesses and their employees whose livelihoods were threatened. In March 2020, the CARES Act was enacted, with the Paycheck Protection Program (PPP) a critical part. PPP loans provided eligible small businesses and nonprofits with fully guaranteed loans with an extremely low interest rate and full forgiveness if all eligibility requirements were met.

4. In March 2021, the American Rescue Plan Act (ARPA) was enacted, with the Restaurant Revitalization Fund (RRF) a critical part. The RRF was a fund "for small, independent restaurants . . . to keep their businesses afloat and their workers paid until the nation is better equipped to fully reopen safely." RRF money was intended to provide eligible restaurants with funding equal to their pandemic-related revenue loss up to $10 million per business. If the funds were used for eligible purposes by March 11, 2023, they had no repayment obligation. To receive RRF money, an applicant was required to complete and submit an RRF application to the SBA (SBA RRF Form 3172).

5. Defendants knowingly submitted (or caused to be submitted) false applications for RRF money for which they were statutorily ineligible because they were not restaurants and did not otherwise meet the eligibility requirements. All Defendants except for the strip club also double dipped and had already received sizeable first and second draw PPP loans, which were also forgiven.

6. Through their fraudulent course of conduct, Defendants knowingly submitted or caused the submission of false or fraudulent claims to the Government, in violation of the False Claims Act, and the Government paid those claims.

7. The False Claims Act is the proper vehicle to hold each Defendant liable for fraudulent use of the RRF. While the United States Attorney's Office for the Northern District of New York has successfully recovered misspent funds under the RRF in two cases, enforcement efforts have not yet made a sufficient dent in the $6.7 billion awarded to potentially ineligible recipients identified by the SBA-OIG. This case squarely presents that opportunity.

https://www.justice.gov/usao-ndny/pr/restaurant-chain-pay-78-million-misrepresenting-eligibility-pandemic-relief-funds (5-5-2025);

https://www.justice.gov/usao-ndny/pr/united-states-attorney-freedman-announces-first-ever-settlement-false-claims-act (11-1-2023)

## II. LEGAL FRAMEWORK

### A. Parties

8. Relator alleges, based upon personal knowledge, relevant documents, and on information and belief, the facts set forth in this Complaint.

9. Relator has standing to bring this action under 31 U.S.C. § 3730(b)(1). Relator's allegations have not been publicly disclosed as that term is defined under 31 U.S.C. § 3730(e)(4)(A). Even if Relator's allegations had been publicly disclosed, Relator is the original source of the allegations in this Complaint under 31 U.S.C. § 3730(e)(4)(B).

10. Relator has complied with all procedural requirements of the laws under which this Complaint is brought.

11. Defendant DNC Parks & Resorts Tusayan Hotel, Inc. d/b/a The Squire at Grand Canyon, a Holiday Inn Resort f/d/b/a Squire Resort at the Grand Canyon f/k/a Squire Motor Inns, Incorporated and Squire Motor Inns Incorporated is a Delaware corporation formed in 2018 that operates a 322-room hotel and resort in Tusayan, Arizona now known as "The Squire at Grand Canyon." It markets itself as providing "top-notch amenities, including indoor and outdoor pools, year-round hot tubs, a fitness center, and family entertainment like bowling, an arcade, and lawn games. At the end of an adventurous day, relax in modern rooms designed for ultimate comfort and convenience. Enjoy a stay that is moments from the South Rim and miles from ordinary." Squire Motor Inns Inc. was the name of the applicant on SBA RRF Form 3172 used to obtain the grant funds alleged here. The hotel underwent several recent acquisitions and, in the past, has done business as Grand Canyon Squire Inn, Squire Resort at the Grand Canyon, and now The Squire at Grand Canyon, a Holiday Inn Resort.

12. **Defendant Delaware North Companies Parks & Resorts, Inc. (Delaware North Parks & Resorts)** is a Delaware corporation formed in 1992. It is the parent to DNC Parks & Resorts Tusayan Hotel, Inc., which is the legal entity that operates The Squire at Grand Canyon, a Holiday Inn Resort. Delaware North Parks & Resorts operates lodging, food, beverage and retail services, along with recreational activities and educational programming at destinations throughout North America, Australia and New Zealand. Its portfolio includes lodging in and near many iconic national and state parks, and it owns and/or operates more than 25 lodging properties including The Squire at Grand Canyon, now considered a "staple" of its portfolio.

13. **Defendant Delaware North Companies, Inc. (Delaware North)** is a Delaware corporation formed in 1972. It is "a global hospitality and entertainment company" and the parent company of Defendant Delaware North Parks & Resorts. In January 2023, it purchased the property in Tusayan, Arizona for an estimated $85 million and assumed the trade name "Squire Resort at the Grand Canyon." In its trade name application, it represented itself as a business that offers "Motel, resort, dining, [and] entertainment." Delaware North is now the owner of The Squire at Grand Canyon. In January 2025, it became part of the IHG Hotels & Resorts family brand. Shortly before this transition, in November 2024, it assumed the trade name "The Squire at Grand Canyon, a Holiday Inn Resort," and in its trade name application, represented itself as a "Business [that] operates as a hotel with restaurant services."

14. **Defendant Lee & J Hospitality, Inc.** is a Texas corporation formed in 2011. Until approximately January 2022, Lee & J Hospitality, Inc. owned Hotel Tucson City Center, a 279-room hotel in Tucson, Arizona that has since been re-zoned as residential apartments after it was acquired by an unrelated entity. It also owns and operates a hotel in Austin, Texas.

15. **Defendant Sterling Real Estate Partners, LLC (Sterling)** is a Delaware limited liability company formed in 2001. It is a real estate investment and development company that was under contract to acquire Hotel Tucson City Center in approximately January 2021, and finalized the acquisition in approximately January 2022, with plans to convert the hotel to residential apartments. In January 2024, Sterling began leasing apartments at the former Hotel Tucson City Center location and no longer operates any portion of it as a hotel.

16. **Defendant White Stallion Ranch, Inc. (White Stallion Ranch)** is an Arizona corporation formed in 1965. It is a 3,000-acre all-inclusive "guest ranch" (or "dude ranch") located in Tucson, Arizona that markets itself as providing an "an authentic outdoor experience" and "a comfortable place to rest your head and recharge away from the demands of our tech-centered world." The dude ranch has a minimum stay requirement, and the "Full American Plan" accommodation rate includes all accommodations, daily riding, and all meals, beverages (except alcohol) and snacks. Its "resort-style" amenities include spa services, fitness center, movie theater, petting zoo, heated pool and hot tub, tennis and pickleball courts, and recreation room.

17. **Defendant Dalton Corporation f/d/b/a Chicas Cabaret** is an Arizona corporation formed in 1993, and on information and belief, was doing business as Chicas Cabaret until at least the start of 2022. It is an "adult entertainment" business ("strip club") located in Phoenix, Arizona.

18. **Defendant C.N.C.G. LLC d/b/a Chicas Cabaret** is an Arizona limited liability company formed in 2008. On information and belief, it began doing business as Chicas Cabaret in or around January 2022.

**B. Jurisdiction and Venue**

19. This Court has jurisdiction over the subject matter and all parties to this action pursuant 28 U.S.C. §§ 1331, 1345, and 1367(a) because this is a civil

action by Relator on behalf of the United States, the real party in interest, arising under the FCA qui tam provisions, and all claims in the action form part of the same case or controversy.

20. The Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because one or more Defendants reside, transact business, or committed an act proscribed by the FCA within this District.

21. Venue is proper in this judicial district and its division, pursuant to 31 U.S.C. § 3732(a), because one or more Defendants transact business in this District, or because an act, proscribed by 31 U.S.C. § 3729, occurred in this District.

**C. Federal False Claims Act**

22. The False Claims Act (FCA) provides, in part, that any person who knowingly presents, or causes to be presented, a false claim for payment or approval; or knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim; or knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government; or conspires to commit a violation of the False Claims Act, is liable to the United States for penalties and treble damages. 31 U.S.C. §§ 3729(a)(1)(A), (B), (C), (G). The FCA defines "obligation" to include an established duty arising from a grantor-grantee relationship. 31 U.S.C. § 3729(b)(3).

23. Knowingly means that the person: (1) had actual knowledge of the information; (2) acted in deliberate ignorance of the truth or falsity of the information; or (3) acted in reckless disregard of the truth or falsity of the

information. The person need not have acted with specific intent to defraud the United States to be liable under the FCA. 31 U.S.C. § 3729(b)(1).

24. A "claim" under the False Claims Act includes any request or demand, whether under a contract or otherwise, for money or property that is presented to an officer, employee, or agent of the United States." 31 U.S.C. § 3729(b)(2)(A)(i).

25. The term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money. 31 U.S.C. § 3729(b)(4).

26. Violations of the FCA subject the defendants to mandatory civil penalties per FCA violation, plus three times the amount of damages that the Government sustains as a result of the defendants' actions. 31 U.S.C. § 3729(a).

27. A person known as a relator may bring a civil action for a violation of 31 U.S.C. § 3729 for the person and for the United States Government. The action shall be brought in the name of the Government. If the Government elects not to proceed with the action, the person who initiated the action shall have the right to conduct the action. If the Government does not proceed with an action under this section, the person bringing the action or settling the claim shall receive an amount which the court decides is reasonable for collecting the civil penalty and damages. The amount shall be not less than 25 percent and not more than 30 percent of the proceeds of the action or settlement and shall be paid out of such proceeds. Such person shall also receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs. All such expenses, fees, and costs shall be awarded against the defendant. 31 U.S.C. §§ 3730(b)(1), (d)(2) and (c)(3).

### D. Statute of Limitations

28. Defendants' conduct alleged in this Complaint began at least as early as 2021. All the claims in this matter are timely under 31 U.S.C. §3731(b).

## III. THE RESTAURANT REVITALIZATON FUND

29. After the 2020 global outbreak of the coronavirus disease (COVID-19), Congress enacted programs to support and fund struggling businesses and their employees whose livelihoods were threatened.

30. In March 2020, the President signed into law the Coronavirus Aid, Relief, and Economic Security Act (CARES Act), P.L. 116-136, a stimulus package to provide emergency assistance to individuals, businesses and certain nonprofits affected by this pandemic. The Paycheck Protection Program (PPP) was a critical part of the CARES Act stimulus package. PPP loans provided eligible small businesses and nonprofits with fully guaranteed loans under section 7(a) of the Small Business Act to pay up to eight weeks of payroll costs, benefits, interest on mortgages, rent, and utilities. They were particularly favorable because they offered an extremely low interest rate and full forgiveness if recipients used the proceeds as required under the CARES Act. The U.S. Small Business Administration (SBA) implemented the PPP in April 2020. CARES Act, Pub. L. 116-136, Div. A, Title I, § 1102, codified at 15 U.S.C. § 636(a)(36); American Rescue Plan Act of 2021, Pub. L. 117-2, Title V, § 5001(d)(1); and Pub. L. 116-136, Div. A, Title I, § 1106.

31. To further support individuals and businesses, in March 2021, the President signed into law a stimulus package to provide emergency assistance aimed at restaurants affected by the pandemic, known as the American Rescue Plan Act of 2021 (ARPA). The ARPA authorized economic relief programs and tax credits. 15 U.S.C. § 9001, et seq., Pub. L. 117-2, Title V, § 5001(d)(1) (ARPA).

32. The Restaurant Revitalization Fund (RRF), also administered by the SBA, was a critical part of the ARPA stimulus package. RRF money provided eligible restaurants with funding equal to their pandemic-related revenue loss up to $10 million for a business with related affiliates with multiple locations, and no more than $5 million for businesses with a single location. If the funds were used for eligible purposes by March 11, 2023, there was no repayment obligation. Thus, the funds were effectively converted to grants on that date.

33. Congress intended that the RRF act as a fund "for small, independent **restaurants** . . . to keep their businesses afloat and their workers paid until the nation is better equipped to fully reopen safely." To receive RRF money, an applicant was required to complete and submit an RRF application to the SBA (SBA RRF Form 3172). The application itself stated that "[t]he purpose of the Restaurant Revitalization Fund (RRF) is **to support the restaurant industry** by providing funding to those that have suffered significant pandemic-related revenue loss." (Emphasis added). H.R. Rep. No. 117-7, at 458 (2-24-2021).

34. The amount of funding awarded was based upon a calculation that required disclosure on the application of eligible expenses, gross receipts, and receipt of PPP funds already received.

35. The applicant was required to describe the nature of its business by checking applicable boxes (e.g., food stand, caterer, bar, restaurant, etc.), make explicit "good faith" certifications of eligibility, and provide specific documentation of gross receipts, among other required information.

36. Businesses that applied to receive RRF money were also required to make these express "good faith" certifications:

- "I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material

respects. I understand that knowingly making a false statement to obtain a grant from SBA is punishable under the law, including under 18 U.S.C. 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 U.S.C. 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally insured institution, under 18 U.S.C. 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000."

- "I acknowledge that SBA will confirm Applicant eligibility for funding under the Restaurant Revitalization Program. I acknowledge that SBA may select my application for audit or review, and I certify that I will provide SBA with requested documentation. I understand, acknowledge, and agree that the Internal Revenue Service can share any tax information that I have provided with SBA's authorized representatives, including authorized representatives of the SBA Office of Inspector General, for the purpose of compliance with all applicable program requirements, regulations, and laws."
- "The Applicant is eligible to receive funding under the rules in effect at the time this application is submitted."

37. Under 15 U.S.C. § 9009c(a)(4)(a), an "eligible entity" was one which was not permanently closed and a **"place of business in which the public or patrons assemble for the primary purpose of being served food or drink"** including:

- restaurants
- food stands, food trucks, food carts

- caterers
- bars, saloons, lounges, taverns
- snack and nonalcoholic beverage bars
- bakeries
- brewpubs, tasting rooms, taprooms
- breweries or microbreweries
- wineries or distilleries
- inns
- licensed facilities or premises of a beverage alcohol producer where public may taste, sample or purchase products

(Emphasis added.)

38. There is a business classification system with corresponding codes used for various purposes such as taxation and grant and contract awards known as the North American Industry Classification System (NAICS). Businesses with these corresponding codes were eligible for the RRF if they met all other eligibility requirements.

| NAICS Code | Business Type |
|---|---|
| 721191 | Inns – bed/breakfast |
| 722320 | Caterers |
| 722330 | Food stands, food cars and trucks (mobile) |
| 722410 | Drinking places - alcoholic (bars, lounges, taverns, brew pubs, tasting rooms, and tap rooms) |
| 722511 | Restaurants – full service/sit down |
| 722513 | Restaurants – limited service/fast-food and carry out |
| 722515 | Snack and nonalcoholic beverage bars, including bakeries – baking and selling on site |
| 312120 | Breweries and microbreweries |
| 312130 | Wineries |
| 312140 | Distilleries |

39. Bed and breakfast inns were eligible for RRF money if they met all requirements. NAICS code 721191 describes bed and breakfast inns as "establishments primarily engaged in providing short-term lodging in facilities known as bed-and-breakfast inns. These establishments provide short-term lodging in private homes or small buildings converted for this purpose. Bed-and-breakfast inns are characterized by a highly personalized service and inclusion of a full breakfast in the room rate."

40. Hotels and motels (NAICS code 721110) were **not** eligible for RRF money. NAICS code 721199 describes cabins, cottages, guest houses, and hostels as "other traveler accommodation" (and distinct from hotels and motels and bed and breakfast inns), and like hotels and motels, those businesses were similarly not eligible for RRF money. The SBA explicitly warned on its website:

> "Are hotels and motels eligible as an 'inn'?"
>
> "No. Hotels and motels are not considered 'Inns' for the purpose of the RRF program."

(Emphasis added.)

41. Businesses such as inns, brew pubs, breweries, wineries, and bakeries, which were not restaurants, were also explicitly warned on the SBA application that they were not eligible for RRF money unless their "onsite sales" specific to food and beverage consumption by the public comprised at least 33 percent of "gross receipts" for each of the years included in the funding calculation ("33 percent gross receipts requirement"). On-site sales were defined as sales of food and/or beverage that were (a) consumed on the applicant's premise, (b) purchased at the applicant's premise to-go, (c) purchased online and picked up at the applicant's premise or (d) delivered directly to a consumer for use.

42. Acceptable documentation of gross receipts and applicable, eligible expenses included:

- business tax returns (IRS Form 1120 or IRS 1120-S)
- IRS Forms 1040 Schedule C; IRS Forms 1040 Schedule F
- IRS Form 1065 (for partnerships)
- bank statements
- prepared financial statements such as income statements or profit and loss statements
- IRS Form 1099-K (point of sale reports)

43. SBA further warned applicants that only businesses that met both the 33 percent gross receipts requirement **and** whose primary function was to serve food or beverages to people who assembled for that purpose were eligible for RRF money:

> To be eligible for RRF assistance, the primary purpose of the entity must be to serve prepared food and beverages. Stated another way, **the primary purpose is for people to assemble for the purpose of being served food or beverage. This eligibility standard must be met in addition to the 33% food/drink sales standard. Even if you meet the 33% food/drink standard, you must have an eligible primary purpose.** The primary purpose of a business may be verified using tax return business codes, prior SBA loan info (PPP NAICS codes) and other private and public data.
>
> For example, the following business types may not be eligible based on available data of primary business function. The below list is a sample of possible ineligible business and each case is separately reviewed.

- An indoor arcade and entertainment venue with an embedded restaurant (single EIN/Tax return)

- **A hotel with a restaurant** (single EIN/Tax return)

- A golf course with a restaurant (single EIN/Tax return)

- A grocery store/market that has made to order food and a sitting area.

- A pool hall with a snack bar

- Vending machine operators

**In the cases above, the available documentation and data may indicate the restaurant is a secondary business function even if food and drink exceed 33%**.

(Emphasis added.)

44. RRF money was expressly limited to small and moderately-sized restaurants. Pursuant to the ARPA, large restaurant chains were never eligible to receive RRF money and applicants were required to make this certification: "The Applicant, together with its affiliates, does not own or operate more than 20 locations, regardless of whether those locations do business under the same or different names." Under 15 U.S.C. § 9009c(a)(2), an "affiliated business" was one "in which an eligible entity has [a] an equity or right to profit distributions of not less than 50 percent, or . . . [b] contractual authority to control the direction of the business." Applicants were also expressly required to identify each "location" or "each place where the Applicant conducts sales from a permanent structure. If the Applicant conducts sales from multiple permanent locations, list each address. For Applicants that operate mobile food trucks, carts, etc., enter the address of the business headquarters."

45. In addition to the explicit eligibility requirements and certifications on the application itself, on April 28, 2021, SBA published an RRF Funding Program

Guide on its website, with instructions to applicants on how to determine eligibility; calculate with precision the allowable funds based on eligible expenses, gross receipts, and receipt of PPP money; identify the business type (e.g., restaurant or inn), affiliates and locations; and all rules and guidance required to accurately complete the application.

## IV. THE FRAUDULENT SCHEME

46. On information and belief, Defendants knowingly submitted (or caused to be submitted) false applications for RRF money for which they were statutorily ineligible; and based on those false representations and certifications, caused the Government to pay money it otherwise would not have paid as summarized below for each Defendant.

| **Hotel or Club (NAICS Code)** | **False Certification** | **Funding Approved** | **Amount of Grant** |
|---|---|---|---|
| **Squire Motor Inns** (72110: "Hotels (except Casino Hotels) and Motels") | "Restaurant &[] bar, saloon, lounge, tavern &[] inn"<br><br>(NAICS codes 721191, 722410 and 722511) | May 18, 2021 | $5,000,000 |
| **Lee & J Hospitality** (721110: "Hotels (except Casino Hotels) and Motels") | "Inn"<br><br>(NAICS code 721191) | May 22, 2021 | $962,550 |
| **White Stallion Ranch** (721199: "Other Traveler Accommodation") | "Inn"<br><br>(NAICS code 721191) | June 4, 2021 | $667,797 |
| **Chicas Cabaret** (711510: "Adult Entertainers") | "Bar, saloon, lounge, tavern"<br><br>(NAICS code 722410) | May 20, 2021 | $616,407 |
| **TOTAL** | | | **$7,246,754** |

(Relator alleges "on information and belief" because, although Relator does not have access to Defendants' SBA RRF Forms 3172, it has drawn reasonable inferences based upon the RRF eligibility requirements and the selection criteria on SBA RRF Form 3172, including the exclusion of hotels and clubs like Defendants here.)

**A. Squire Motor Inns**

47. Defendant Squire Motor Inns knowingly submitted (or caused to be submitted) a false application for RRF money for which it was statutorily ineligible under 15 U.S.C. § 9009c(a)(4)(a); and based on those false representations and certifications, caused the Government to pay money it otherwise would not have paid in violation of the False Claims Act.

48. Squire Motor Inns is a "**hotel operator**" of a 322-room hotel and resort in Tusayan, Arizona, which markets itself as a "full-service resort[]" and "hotel." (Emphasis added.)

49. On April 13, 2020, and April 2, 2021, Squire Motor Inns submitted applications for PPP loans in the amount of $1,140,355 and $1,455,891, and the Government paid those amounts. On those applications, it self-certified as "**Hotels (except Casino Hotels) and Motels**" (**NAICS code 721110**). On May 14, 2021, and July 18, 2023, both PPP loans (including interest accrued) were forgiven. (Emphasis added.)

50. On May 18, 2021, on information and belief, Squire Motors Inn fraudulently certified its eligibility for $5 million in RRF money as a "**Restaurant &[] Bar, Saloon, Lounge, Tavern &[] Inn**" (**NAICS codes 721191, 722410 and 722511**) on SBA RRF Form 3172, even though the nature of its hotel business had not changed since its PPP loan applications, which it submitted (or caused to be submitted) to the Government; and the Government paid that amount based on the false representations in the application. (Squire Motor Inns Inc. was the name of

the applicant on Form 3172.) On information and belief, on March 11, 2023, Defendant was no longer obligated to repay the grant. (Emphasis added.) 15 U.S.C. § 9009c(a)(4)(a).

51. Squire Motor Inns was the largest recipient of RRF money in the state of Arizona, receiving $1.3 million more than any other applicant in the state.

52. The Government paid Squire Motor Inns a total of $7,596,246 (and waived accrued interest), in pandemic relief funds with no repayment obligation.

| **Government Money** | **Business Certification** | **Award Amount** | **Award Date** | **Loan Forgiveness Date or End Date of Grant Repayment Obligation** |
|---|---|---|---|---|
| **PPP Initial Draw** | Hotel (except Casino Hotels) and Motel<br><br>(NAICS code 721110) | $1,140,355 | 04/13/2020 | 5/14/2021 |
| **PPP Second Draw** | Hotel (except Casino Hotels) and Motel<br><br>(NAICS code 721110) | $1,455,891 | 04/02/2021 | 7/18/2023 |
| **RRF** | Restaurant & Bar, Saloon, Lounge, Tavern & Inn<br><br>(NAICS codes 721191, 722410 and 722511) | $5,000,000 | 05/18/2021 | 03/11/2023 |

53. Squire Motor Inns was knowingly ineligible for the RRF money for at least two additional reasons. Based on reported pre-pandemic revenue for 2018-2019 and 2019-2020, it knowingly failed to (a) meet the 33 percent gross receipts

requirement because the bulk of its revenue is from its hotel business, or (b) account for the PPP loan money in calculating the amount of the RRF grant award.

**B. Lee & J Hospitality**

54. Defendant Lee & J Hospitality knowingly submitted (or caused to be submitted) a false application for RRF money for which Lee & J Hospitality was statutorily ineligible under 15 U.S.C. § 9009c(a)(4)(a); and based on those false representations and certifications, caused the Government to pay money it otherwise would not have paid in violation of the False Claims Act.

55. Until approximately January 2022, Lee & J Hospitality owned Hotel Tucson City Center, a 279-room hotel in Tucson, Arizona until it was acquired by Defendant Sterling, a real estate investment company, and converted to residential apartments.

56. On May 1, 2020, and February 13, 2021, Lee & J Hospitality submitted applications for PPP loans in the amount of $210,360 and $293,247, and the Government paid those amounts. On those applications, it self-certified as **"Hotels (except Casino Hotels) and Motels" (NAICS code 721110)**. On March 10, 2021, and November 17, 2021, both PPP loans (including interest accrued) were forgiven. (Emphasis added.)

57. On May 22, 2021, on information and belief, Lee & J Hospitality, fraudulently certified its eligibility for $962,550 in RRF money as an "**inn**" **(NAICS code 721191)** on SBA RRF Form 3172, even though the nature of its hotel business had not changed since its PPP loan applications, which it submitted (or caused to be submitted) to the Government; and the Government paid that amount based on the false representations in the application. On information and belief, on March 11, 2023, Defendant was no longer obligated to repay the grant. (Emphasis added.)

58. The Government paid Lee & J Hospitality a total of $1,466,157 (and waived accrued interest), in pandemic relief funds with no repayment obligations.

| Government Money | Business Certification | Award Amount | Award Date | Forgiveness Date or End Date of Grant Repayment Obligation |
|---|---|---|---|---|
| **PPP Initial Draw** | Hotel (except Casino Hotels) and Motel<br><br>(NAICS code 721110) | $210,360 | 05/01/2020 | 03/10/2021 |
| **PPP Second Draw** | Hotel (except Casino Hotels) and Motel<br><br>(NAICS code 721110) | $293,247 | 02/13/2021 | 11/17/2021 |
| **RRF** | Inn<br><br>(NAICS code 721191) | $962,550 | 05/22/2021 | 03/11/2023 |

**C. White Stallion Ranch**

59. Defendant White Stallion Ranch knowingly submitted (or caused to be submitted) a false application for RRF money for which it was statutorily ineligible under 15 U.S.C. § 9009c(a)(4)(a); and based on those false representations and certifications, caused the Government to pay money it otherwise would not have paid in violation of the False Claims Act.

60. White Stallion Ranch markets itself as a "dude ranch" with a minimum stay requirement, and the "Full American Plan" accommodation rate includes all accommodations, daily riding, and all meals, beverages (except alcohol) and snacks.

61. On April 27, 2020, and January 21, 2021, White Stallion Ranch submitted applications for PPP loans in the amount of $383,427, and $536,798, and the Government paid those amounts. On these applications, it self-certified as an "**other traveler accommodation**" (**NAICS code 721199**). On November 5, 2020, and September 7, 2021, both PPP loans (including interest accrued) were forgiven. (Emphasis added.)

62. On June 4, 2021, on information and belief, White Stallion Ranch fraudulently certified its eligibility for $667,797, in RRF money as an "**inn**" (**NAICS code 721191**) on SBA RRF Form 3172, even though the nature of its business had not changed since its PPP loan applications, which it submitted (or caused to be submitted) to the Government; and the Government paid that amount based on the false representations in the application. On information and belief, on March 11, 2023, Defendant was no longer obligated to repay the grant. (Emphasis added.) 15 U.S.C. § 9009c(a)(4)(a).

63. The Government paid White Stallion Ranch a total of $1,588,022 (and waived accrued interest), in pandemic relief funds with no repayment obligation.

| Government Money | Business Certification | Award Amount | Award Date | Forgiveness Date or End Date of Grant Repayment Obligation |
|---|---|---|---|---|
| **PPP Initial Draw** | Other Traveler Accommodation<br><br>(NAICS code 721199) | $383,427 | 04/27/2020 | 11/05/2020 |
| **PPP Second Draw** | Other Traveler Accommodation<br><br>(NAICS code 721199) | $536,798 | 01/21/2021 | 09/07/2021 |
| **RRF** | Inn<br><br>(NAICS code 721191) | $667,797 | 06/04/2021 | 03/11/2023 |

### D. Chicas Cabaret

64. Defendant Chicas Cabaret knowingly submitted (or caused to be submitted) a false application for RRF money for which it was statutorily ineligible under 15 U.S.C. § 9009c(a)(4)(a); and based on those false representations and certifications, caused the Government to pay money it otherwise would not have paid in violation of the False Claims Act.

65. Chicas Cabaret is a strip club. In its application for a liquor license, it self-certified as a "topless bar" and "adult venue."

66. On May 20, 2021, on information and belief, Chicas Cabaret fraudulently certified its eligibility for $616,407, in RRF money as a "**bar, saloon, lounge, tavern**" **(NAICS code 722410)**, on SBA RRF Form 3172, which it submitted (or caused to be submitted) to the Government; and the Government

paid that amount based on the false representations in the application. On information and belief, on March 11, 2023, Defendant was no longer obligated to repay the grant. (Emphasis added.)

67. The primary purpose of adult entertainment is **not** "for people to assemble for the purpose of being served food or beverage." The Government specifically stated that "[b]usinesses that present live performances of a prurient sexual nature" are ineligible for RRF money. Further, after the first round of PPP initial draws, the Government expressly banned the provision of pandemic relief funding for adult entertainment. In a challenge to this ban on First Amendment grounds, the Seventh Circuit upheld the funding ban, concluding that "Congress is not trying to regulate or suppress plaintiffs' adult entertainment. It has simply chosen not to subsidize it."

68. In a challenge of the adult entertainment ban under the RRF, the Government restated its position:

> **Larry Flynt's Hustler Club is not a restaurant**. **People don't go to strip clubs for the food, any more than they go to the movies for popcorn**. Yet Plaintiffs' entire case is based on the unspoken premise that "patrons assemble" at their establishments "for the primary purpose of being served food or drink." *See* 15 U.S.C. § 9009c(a)(4)(A). That premise defies not only common sense, but also Congress's intent in passing the American Rescue Plan Act, Pub. L. No. 117-2, 135 Stat. 4 (2021) ("ARPA"). Therefore, the premise must be rejected, and with it Plaintiffs' claims in this case.
>
> ***

> First, Plaintiffs have no likelihood of successfully obtaining RRF funding, **because their establishments, as strip clubs, do not qualify as places of business where people congregate for the primary purpose of being served food or drink—the threshold statutory requirement for RRF eligibility**. 15 U.S.C. § 9009c(a)(4)(A).
>
> ***
>
> **it is not sufficient merely to serve some food or drink. ARPA makes clear that Congress intended to limit RRF eligibility to businesses in which "patrons assemble for *the primary purpose of being served food or drink.*"** 15 U.S.C. § 9009c(a)(4)(A) (emphasis added)
>
> ***
>
> Plaintiffs' NAICS 722410 classification proves that they do not meet the "primary-purpose" test for food because they offer only "limited food services."

(Emphasis added.)

69. Based on the false representations, the Government paid Chicas Cabaret $616,407, in pandemic relief funds with no repayment obligation.

## V. MATERIALITY

70. Defendants knew that compliance with requirements for RRF money and truthful records and statements in support of applications for RRF money were material to the Government's decision to pay.

71. Some of the factors in evaluating materiality under the False Claims Act include (a) statutory, regulatory, and contractual language, (b) whether the violations go to the heart of the benefit of the bargain, (c) whether the violations

were serious and material and not merely technical or minor infractions of rules, (d) the Government's actions relative to similar violations, (e) whether any reasonable person would attach importance to Defendants' choice of actions, and (f) Defendants' knowledge relative to these factors. All these factors demonstrate materiality in this case and have been addressed throughout this Complaint.

72. Defendants knowingly submitted or caused to be submitted false or fraudulent claims for payment or approval for ineligible RRF grants; and the Government paid those claims that it otherwise would not have paid.

73. Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims for ineligible RRF grants; and the Government paid those claims that it otherwise would not have paid.

74. Defendants knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the Government by knowingly failing to repay their fraudulently obtained RRF grants; and the Government paid those claims that it otherwise would not have paid.

75. The RRF was intended to help certain small and medium-sized restaurants and similar businesses facing the economic hardships of the pandemic. However, the Government relied upon applicants to self-certify their eligibility and act in good faith. The SBA-OIG warned applicants that the agency would "review and recover funds awarded to applicants that did not meet eligibility requirements or received funds that exceeded statutory limits."

76. The Government has used its enforcement tools to recover misspent RRF money improperly paid to fraudsters and cheats as alleged here.

77. In one example, in May 2025, a restaurant chain agreed to pay more than $7.8 million to resolve False Claims Act allegations that it falsely certified eligibility for an RRF grant when it knew or should have known that it operated too many locations to qualify. When speaking about the settlement, the United States Attorney for the Northern District of New York stated that the ineligible recipient "not only diverted funds from eligible recipients but also eroded public trust in critical relief efforts. Our office remains committed to enforcing the False Claims Act and holding accountable those who misrepresent their eligibility for federal funding." https://www.justice.gov/usao-ndny/pr/restaurant-chain-pay-78-million-misrepresenting-eligibility-pandemic-relief-funds (5-5-2025)

78. In November 2023, the owner of multiple restaurants agreed to pay $2 million to resolve False Claims Act allegations that it falsely certified eligibility for an RRF grant when it knew or should have known that it operated too many locations to qualify. When speaking about the settlement, the United States Attorney for the Northern District of New York emphasized that RRF "was meant to provide a financial lifeline to restaurants and other eligible entities that were struggling to stay afloat during the COVID-19 pandemic. [Defendants] are paying a steep price for falsely certifying their eligibility for these funds." https://www.justice.gov/usao-ndny/pr/united-states-attorney-freedman-announces-first-ever-settlement-false-claims-act (11-1-2023)

79. These cases demonstrate that Defendants' same or similar conduct alleged in this Complaint was material to the Government's decision to pay RRF grants.

80. The facts alleged in the Complaint show that Defendants were well aware of the statutory and regulatory requirements for RRF grants; and, further, that the violations alleged in this Complaint were material to the Government's decision to pay.

81. Defendants also well knew that the unlawful conduct alleged in this Complaint went to the very heart of the bargain for the payment of claims for RRF grants. The Government expects and requires that claims be paid only for accurate and truthful claims for RRF grants.

82. RRF statutory and programmatic requirements for complete, accurate, and truthful reporting during the application process go directly to the "essence of the bargain." These requirements are neither "minor nor insubstantial."

83. Defendants' violations of the statutory, regulatory, and programmatic requirements were serious and material, leading to actual or potential harm, and were made with at least reckless disregard of the seriousness of their violations.

84. Defendants' violations were not immaterial or inadvertent technical mistakes in processing paperwork, or simple and honest misunderstanding of the rules, terms and conditions, or certification requirements. Rather, Defendants knowingly failed to comply with material legal obligations and certifications.

85. Defendants knew that they were submitting or causing to submit false or fraudulent claims for, and false or fraudulent statements or records in support of false claims for RRF grants, which the Government paid to them.

86. In short, there is ample evidence to show that Defendants knew or should have known that their violations had the natural tendency to influence the Government's decision to pay the claims for RRF grants and that any reasonable person would attach importance to Defendants' choice of action.

## VI. COUNTS

**COUNT I**
**Federal False Claims Act**
**31 U.S.C. §§ 3729(a)(1)(A), (B), (C), (G)**
**(Defendants DNC Parks & Resorts Tusayan Hotel, Inc. d/b/a The Squire at Grand Canyon, a Holiday Inn Resort f/d/b/a Squire Resort at the Grand Canyon f/k/a Squire Motor Inns, Incorporated and Squire Motor Inns Incorporated, Delaware North Companies Parks & Resorts, Inc., and Delaware North Companies, Inc.)**

87. The allegations in the preceding paragraphs are incorporated by reference.

88. Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval in violation of § 3729(a)(1)(A); knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims, in violation of § 3729(a)(1)(B); conspired to commit a violation of the False Claims Act, in violation of § 3729(a)(1)(C); and/or knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government, in violation of § 3729(a)(1)(G).

89. The United States paid for claims that it otherwise would not have allowed; or paid money that it otherwise would not have paid.

90. Because of these violations, Defendants are jointly and severally liable to the United States for incurred damages resulting from such false claims, trebled, plus civil penalties for each violation of the Act, and liable for all other relief authorized by the statute.

91. As a result of Defendants' violations, the United States has suffered damages in an amount to be determined at trial.

**COUNT II**
**Federal False Claims Act**
**31 U.S.C. §§ 3729(a)(1)(A), (B), (C), (G)**
**(Defendants Lee & J Hospitality, Inc. and Sterling Real Estate Partners, LLC)**

92. The allegations in the preceding paragraphs are incorporated by reference.

93. Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval in violation of § 3729(a)(1)(A); knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims, in violation of § 3729(a)(1)(B); conspired to commit a violation of the False Claims Act, in violation of § 3729(a)(1)(C); and/or knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government, in violation of § 3729(a)(1)(G).

94. The United States paid for claims that it otherwise would not have allowed; or paid money that it otherwise would not have paid.

95. Because of these violations, Defendants are jointly and severally liable to the United States for incurred damages resulting from such false claims, trebled, plus civil penalties for each violation of the Act, and liable for all other relief authorized by the statute.

96. As a result of Defendants' violations, the United States has suffered damages in an amount to be determined at trial.

**COUNT III**
**Federal False Claims Act**
**31 U.S.C. §§ 3729(a)(1)(A), (B), (G)**
**(Defendant White Stallion Ranch, Inc.)**

97. The allegations in the preceding paragraphs are incorporated by reference.

98. Defendant knowingly presented or caused to be presented false or fraudulent claims for payment or approval in violation of § 3729(a)(1)(A); knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims, in violation of § 3729(a)(1)(B); and/or knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government, in violation of § 3729(a)(1)(G).

99. The United States paid for claims that it otherwise would not have allowed; or paid money that it otherwise would not have paid.

100. Because of these violations, Defendant is liable to the United States for incurred damages resulting from such false claims, trebled, plus civil penalties for each violation of the Act, and liable for all other relief authorized by the statute.

101. As a result of Defendant's violations, the United States has suffered damages in an amount to be determined at trial.

**COUNT IV**
**Federal False Claims Act**
**31 U.S.C. §§ 3729(a)(1)(A), (B), (C), (G)**
**(Defendants Dalton Corporation f/d/b/a Chicas Cabaret and C.N.C.G. LLC d/b/a Chicas Cabaret)**

102. The allegations in the preceding paragraphs are incorporated by reference.

103. Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval in violation of § 3729(a)(1)(A); knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims, in violation of § 3729(a)(1)(B); conspired to commit a violation of the False Claims Act, in violation of § 3729(a)(1)(C); and/or knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government, in violation of § 3729(a)(1)(G).

104. The United States paid for claims that it otherwise would not have allowed; or paid money that it otherwise would not have paid.

105. Because of these violations, Defendants are jointly and severally liable to the United States for incurred damages resulting from such false claims, trebled, plus civil penalties for each violation of the Act, and liable for all other relief authorized by the statute.

106. As a result of Defendants' violations, the United States has suffered damages in an amount to be determined at trial.

**PRAYER FOR RELIEF**

**WHEREFORE**, Relator, on behalf of Relator and the United States, prays:

(a) That the Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of any amount within the applicable statutory ranges, for each violation;

(b) That Relator be awarded an amount that the Court decides is reasonable for recovering the proceeds of the action, including but not necessarily limited to the civil penalties and damages, on behalf of the

United States, which, pursuant to the False Claims Act, shall be at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim if the Government intervenes and proceeds with the action, and not less than 25 percent nor more than 30 percent of the proceeds of the action or settlement of the claim if the Government does not intervene;

(c) That judgment be entered against Defendants jointly and severally as between or among related Defendants as per the counts above, in the amounts to be determined at trial; and

(d) That Relator be awarded all costs and expenses incurred, including reasonable attorneys' fees; and

(e) That the Court order such other relief as is appropriate.

Trial by jury is hereby requested.

Dated: June 25, 2025

Respectfully submitted,

/s/ Nicholas A. Verderame
NICHOLAS A. VERDERAME
Bar No. 030683
Plattner Verderame PC
316 E. Flower St.
Phoenix, AZ 85012
Telephone: 602-266-2002, x.106
Fax: (602) 266-6908
nverderame@pvazlaw.com

/s/ Renée Brooker
RENÉE BROOKER
D.C. Bar No. 430159
(*pro hac vice* filing to follow)
Tycko & Zavareei LLP
2000 Pennsylvania Avenue NW
Suite 1010
Washington, DC 20006
(202) 417-3664
Fax: (202) 973-0950
reneebrooker@tzlegal.com

*Attorneys for Plaintiff-Relator*

**DO NOT SERVE**

**FALSE CLAIMS ACT COMPLAINT FILED UNDER SEAL**

**Certificate of Service**

I hereby certify that on June 25, 2025, I caused the foregoing to be filed under seal with the Clerk of the Court, and that I will cause a true and accurate copy of the file-stamped False Claims Act qui tam complaint and a written disclosure of substantially all material evidence and information the Relator possesses under 31 U.S.C. § 3730(b)(2), by USPS registered mail, return receipt requested to be served upon the following:

Pamela Bondi
United States Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Timothy Courchaine
Interim United States Attorney
c/o Civil Process Clerk
Two Renaissance Square
40 N. Central Avenue
Suite 1800
Phoenix, AZ 85004-4449

/s/ Renée Brooker
Renée Brooker